# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

---

In re: CCA Recordings 2255 Litigation,
                                    **Petitioners,**

**v.**                                          **Case No. 19-cv-2491-JAR-JPO**

                                        **(This Document Relates to Case No. 14-cr-20096-JAR-8,** *United States v. Hector Valdez***, and Case No. 19-2254-JAR-JPO,** *Hector Valdez v. United States***)**

**United States of America.**
                      **Respondent.**

---

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Hector Valdez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. No. 616).[1]  Petitioner alleges the government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-client communications, and asks the Court to find that he has made a sufficient showing to warrant an evidentiary hearing.  As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, to reduce his custodial sentence by 50% and vacate his term of supervised release.  The government has responded, opposing the motion and seeking dismissal on several grounds, including on threshold jurisdictional grounds.[2]  The Court held that because the alleged Sixth Amendment violation occurred after Petitioner entered his

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 14-20096-JAR-8.  Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO.  With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] *Valdez v. United States*, No. 19-2254-JAR-JPO, Docs. 3, 6.

guilty plea but before he was sentenced, he lacked standing to challenge his conviction, but not his sentence.[3]  The Court has reviewed the parties' submissions and the record and is prepared to rule.  For the reasons explained in detail below, Petitioner's challenge to his sentence, including any term of supervised release, is denied without an evidentiary hearing.  Petitioner is also denied a certificate of appealability.

## I.      Background

### A.      Procedural History

Petitioner was charged in a Superseding Indictment with conspiracy to distribute and possess with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 846.[4]  On April 20, 2016, Petitioner pleaded guilty to the offense without a plea agreement.[5]

Based on a total offense level of 38 and a criminal history category of I, the Presentence Investigation Report ("PSR") calculated Petitioner's advisory Guidelines range at 235 to 293 months.[6]  The government did not file any objections to the PSR or a sentencing memorandum prior to the sentencing hearing.  Petitioner raised several objections to the offense level calculation and facts asserted in the PSR.[7]  The government opposed Petitioner's objections, including a claim that he was eligible for Safety Valve relief.

On December 22, 2016, the Court overruled Petitioner's objections, including his claim for Safety Valve eligibility, adopted the PSR's sentencing calculations, and found that the

---

[3] *CCA Rec. Lit.* Docs. 730, 784.

[4] Doc. 47.

[5] Doc. 294.

[6] Doc. 387 ¶ 74.

[7] *Id.* ¶¶ 100–01, 111–12, 116–23, 130–31, 135–36.

Guidelines range was 235 to 293 months' imprisonment.[8]  The government requested a 264-month sentence, while Petitioner asked for a term of 144 months.[9]  The Court sentenced Petitioner to a term of 235 months' imprisonment, followed by a five-year term of supervised release.[10]  Petitioner appealed his sentence, and the Tenth Circuit affirmed.[11]  On June 1, 2018, Petitioner filed a Motion to Reduce Sentence under § 3582(c)(2), which this Court denied.[12]  The Court also denied Petitioner's subsequent motion for compassionate release.[13]  He has not filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was represented by Robert Calbi in the underlying criminal proceedings.  The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[14]  On May 22, 2019, the FPD filed this § 2255 motion on Petitioner's behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship.  Petitioner's projected release date is December 12, 2031.[15]

B.     The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motion before the Court.[16]  That comprehensive opinion was

---

[8] Tr. Sent. Hrg., Doc. 486 at 60–71, 86–87.

[9] *Id.* at 77, 79.

[10] *Id.* at 71; Doc. 436.

[11] *United States v. Valdez*, 723 F. App'x 624, 627–29 (10th Cir. 2018).

[12] Docs. 533, 534.

[13] Doc. 683.

[14] Standing Order 18-3.

[15] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Jan. 3, 2022).

[16] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[17]  The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had a practice of routinely obtaining CCA recorded attorney-client phone calls from CCA, and that it did so without notice to attorneys, clients, or courts.[18]

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[19] (2) the video and audio recordings in USAO custody to be impounded;[20] and (3) the government to preserve

---

[17] *Id.* at 70–80.

[18] *Id.* at 29–30.

[19] *Black*, Doc. 253 at 3.

[20] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

its computer hard drives.[21]  By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigation, that is, to determine the number of recordings possessed by the government, to index and segregate them, and to identify privileged or confidential information within those recordings.[22]

On January 31, 2017, the Special Master issued the "First Report Regarding Video Recordings."[23]  The Special Master determined that the government had obtained from CCA video recordings of the attorney-meeting rooms made between February 20, 2016, and May 16, 2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700 attorney visits.[24]  This Court in *Black* found that the USAO did not come into possession of the CCA videos until June 1, 2016.[25]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[26]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[27]

The government did not cooperate with the Special Master's investigation, however, which ultimately resulted in a lengthy delay in this Court's ability to rule on these issues.

---

[21] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[22] *Black*, Doc. 146 (Appointment Order).

[23] *Black*, Doc. 193.

[24] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

[25] *Black* Order at 66.

[26] *CCA Rec. Lit.*, Doc. 784 at 13.

[27] *CCA Rec. Lit.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[28]  The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[29]  The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's decision in *Shillinger v. Haworth*,[30] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[31]  Once those elements are established, prejudice is presumed.[32]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[33]  While recognizing that the attorney-client privilege is not a right

---

[28] *Black* Order at 164–65.

[29] *Id.* at 145–62.

[30] 70 F.3d 1132 (10th Cir. 1995).

[31] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[32] *Id.*

[33] *Id.* at 163.

guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD in each individual case: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[34]  This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[35]

### C.      Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[36]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for

---

[34] *Id.* at 166.

[35] *Id.*

[36] *CCA Rec. Lit.*, Doc. 1.

video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations, as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[37]  The government raised blanket objections to the privilege logs, arguing that many fail to meet the threshold showings because (1) they do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not sufficient to establish privileged attorney-client communications are depicted on a soundless video.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[38]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court

---

[37] *CCA Rec. Lit.*, Doc. 21 at 50.

[38] *CCA Rec. Lit.*, Docs. 587, 588.

sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[39]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[40]  Specifically, the Court ruled that three petitioners in this consolidated litigation who proceeded to trial in their underlying criminal proceedings are entitled to evidentiary hearings on their audio recording Sixth Amendment claims.   Second, the Court determined that the rule in *Tollett v. Henderson* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[41]  The Court dismissed one petitioner's § 2255 motion on these grounds and certified the issue for appeal; thirty-nine petitioners have successfully moved the Court to stay dismissal of their claims pending the appeal of that case.[42]  Third, the Court determined that approximately twenty petitioners lacked standing to advance their Sixth Amendment claims for various reasons, including: claims that alleged post-sentencing violations; claims where petitioners who had been deported challenged only their sentence; claims where petitioners

---

[39] *Id.*  The Court subsequently denied petitioners' related Motion for Spoliation Sanctions under Fed. R. Civ. P. 37(e)(2) alleging that the government destroyed or lost ESI relative to the video recordings.  *CCA Rec. Lit.*, Doc. 926.

[40] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[41] *Id.*  (citing 411 U.S. 258 (1973)).

[42] *CCA Rec. Lit.*, Docs. 874, 922.

challenging their sentence had been sentenced to the mandatory-minimum sentence; and claims involving binding pleas that were accepted by the court at the change-of-plea-hearing.[43]

Petitioner timely filed his Rule 2(b) certification on February 25, 2021.[44]

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[45]

### D.      Recordings in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of the *Black* investigation.[46]   The FPD, along with defense counsel, reviewed two video recordings of Petitioner meeting with Calbi in person at CCA on March 23 and April 1, 2016.[47]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during these meetings, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Calbi.[48]   Petitioner also provided a sworn declaration from Calbi, stating that he reviewed the video recordings listed on the privilege log that occurred on March 23 and April 1, 2016, and confirmed, with respect to the recorded meetings and each other meeting with Petitioner at CCA: (1) the only reason he met with Petitioner "was to discuss matters related to legal advice or strategy"; and (2) he had no knowledge nor did he believe that

---

[43] *CCA Rec. Lit.*, Docs. 730, 784.

[44] CCA Rec. Lit., Doc. 775-1.

[45] *CCA Rec. Lit.*, Doc. 1034.

[46] *Black* Order at 165.

[47] *CCA Rec. Lit.,* Doc. 205-2 at 213–14.

[48] *Id.*

the meetings were recorded as they were attorney-client protected, that he did not consent to such, and that he was not aware such recordings would be dispensed to prosecutors.[49]

Petitioner was prosecuted by former SAUSA Tomasic and AUSA David Zabel, who denies that he viewed the recording during the pending underlying case.[50]

The Court reviewed the video recording *in camera*. As set out in the privilege log, the Court confirms that the first video recording shows Petitioner meeting with Calbi on March 23, 2016 for approximately one hour and ten minutes, where they reviewed documents, a tablet, and a book.  The second recording, dated April 1, 2016, shows Petitioner meeting with Calbi for fifty-eight minutes, during which time they reviewed documents and talked.  In light of the analysis below, however, further details of the meeting visible in the video are not pertinent and will not be discussed in this order.

## II.    Discussion

### A.    Procedural Defenses

The government does not raise any procedural defenses in this case.[51]

### B.    Decision in Consolidated Proceedings

The Court entered a Memorandum and Order on December 10, 2021, that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule, which is incorporated by reference herein.[52]

---

[49] *Valdez v. United States*, No. 19-2254-JAR-JPO, Doc. 4-1.

[50] *Id.*, Doc. 3-1.

[51] The government concedes that the ruling in *Tollett v. Henderson*, 411 U.S. 258, 267 (1973), does not foreclose petitioners' claims where the alleged constitutional violation took place after a petitioner entered a guilty plea.  *See CCA Rec. Lit.*, Doc. 730 at 41.

[52] *CCA Rec. Lit.*, Doc. 1034.

As discussed in detail in that Order, the Tenth Circuit has recognized that a per se *Shillinger* violation constitutes a narrow variety of presumptively prejudicial constitutional error where the government's unjustified purposeful intrusion into a defendant's attorney-client relationship precludes application of the harmless-error standard and requires automatic relief.[53] The Court went on to conclude, however, that the categorical extension of *Shillinger*'s per se rule to violations that occurred post-plea or conviction but prior to sentencing would amount to an overapplication of that ruling beyond the rationale contemplated and described by the Tenth Circuit.[54]  Accordingly, the Court declined to extend *Shillinger*'s per se rule to an alleged pre-sentence Sixth Amendment violation and prejudice is not to be presumed in this category of claims.[55]  Instead, petitioners must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[56]

## C.    Application

Petitioner's claim is in the temporal category of motions alleging post-plea/pre-sentencing Sixth Amendment violations.  Petitioner's motion falls in a sub-category of these claims where the petitioner pleaded guilty without a plea agreement.  The recorded meetings between Petitioner and Calbi took place on March 23 and April 1, 2016 and predate Petitioner's April 20, 2016 plea.  As noted above, however, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after Petitioner's plea but before he was sentenced on December 22, 2016.

---

[53] *Id.* at 14.

[54] *Id.* at 20–21.

[55] *Id.* at 21.

[56] *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the petitioner enters a guilty plea, it eliminates the possibility that the intrusion could have tainted the petitioner's conviction.[57]  Thus, Petitioner does not have standing to challenge his guilty plea under § 2255.[58]  The only tainted proceeding could be sentencing.  Having determined that this category of governmental-intrusion claims may not rely on the *Shillinger* presumption of prejudice, the Court turns to whether Petitioner has demonstrated a realistic possibility of injury or benefit to the government.  Even assuming Petitioner has satisfied the other elements of his Sixth Amendment claim, he cannot show any realistic possibility that he was prejudiced as a result of the government's alleged intrusion.

Petitioner received a sentence at the bottom of the advisory Guidelines range.  The government did not raise any objections to the PSR or file any other motions regarding Petitioner's sentencing, and, although the government argued for a sentence in the middle of the Guidelines range due to Petitioner's role in the offense, there is no indication the government attempted to apply any pressure on Petitioner to abandon his objections and it withheld from pursuing a role enhancement.  The Court was not persuaded by the government's sentencing request, and the Tenth Circuit affirmed the sentencing decisions that were raised on appeal. Petitioner has not demonstrated, nor can the Court imagine, any realistic possibility of prejudice under these circumstances.

Because Petitioner has not shown and cannot show a realistic possibility of prejudice as a result of the government's alleged intrusion into his attorney-client relationship, and nothing in the record suggests any threat to the reliability or fairness of Petitioner's sentencing proceedings,

---

[57] Doc. 730 at 54.

[58] *Id.*

he cannot succeed on his Sixth Amendment claim.  Petitioner's § 2255 motion is therefore denied.

### III.      Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[59]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[60]  For the reasons stated above, the Court finds that Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Hector Valdez's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 616) is **denied** without an evidentiary hearing.  Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: <u>January 3, 2022</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[59] 28 U.S.C. § 2253(c)(2).

[60] *Saiz v. Ortiz,* 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke,* 542 U.S. 274, 282 (2004)).